Central Ceilings, Inc. *vs.* National Amusements, Inc.

No. 06-P-291.

Essex. February 26, 2007. - September 18, 2007.

Present: Perretta, Smith, & Vuono, JJ.

*Contract,* Performance and breach, Novation, Consideration. *Frauds, Statute of.*

Discussion of the "leading object" or "main purpose" exception to the Statute of Frauds. [177-178]

In a civil action for breach of an oral agreement to pay for certain construction work that the plaintiff subcontractor performed on the defendant's theater, the Superior Court judge properly subjected the plaintiff's claim to the preponderance of the evidence standard of proof. [178-179]

In a construction contract dispute, the Superior Court judge properly denied the defendant's motions for a directed verdict, for judgment notwithstanding the verdict, and for a new trial, where the "main purpose" exception to the Statute of Frauds applied to the defendant's oral promise to pay the plaintiff subcontractor, in that the defendant's promise was given to secure the plaintiff's continued performance on the project, and satisfaction of the general contractor's obligation was merely incidental, rather than the source of a novation [179-182]; further, the defendant's promise was supported by valid consideration [182-183].

This court declined to consider an issue that the defendant failed to preserve for appellate consideration. [183-184]

Civil action commenced in the Superior Court Department on March 20, 2001.

The case was tried before *Christine M. McEvoy,* J., and a motion for judgment notwithstanding the verdict or new trial was heard by her.

*H. Charles Hambelton* for the defendants.

*Paul R. Mordarski* (*Thomas J. Fullam* with him) for the plaintiff.

Perretta, J. Central Ceilings, Inc. (Central), brought the present action against National Amusements, Inc. (National), seeking damages sustained as a result of a breach of an oral agreement it had with National. In answers to special questions, see Mass.

R.Civ.P. 49(a), 365 Mass. 813 (1974), a jury found that National was in breach of an oral promise to pay Central for its work. On appeal, National argues that the judge erred in denying its motions for a directed verdict, for judgment notwithstanding the verdict, and for a new trial. The principal issue before us on National's appeal is whether enforcement of the oral agreement is barred by the Statute of Frauds, G. L. c. 259, § 1, Second (the Statute). We agree with the judge's conclusion that the "main purpose" exception to the Statute was applicable and affirm the judgment.[1]

1. *The facts.* There was evidence to show the following facts. National is the owner of a cinema theater complex in Lawrence. This dispute arose out of the construction of that complex (the Project). On or about March 10, 2000, National entered into a contract with Old Colony Construction Corporation (Old Colony), the general contractor, with an anticipated completion date of June 28, 2000. Central submitted a bid to Old Colony that Old Colony accepted on March 17, 2000, making Central a "core" subcontractor; specifically, Central was to do the drywall, acoustical, carpentry, and hardware installation work at the Project.

Meeting the anticipated completion date of June 28, 2000, proved difficult if not improbable due, in part, to delays caused by problems related to groundwater at the construction site. It was discovered in late April of 2000 that the groundwater table at the construction site was higher than originally thought. Consequently, National was required to redesign structural and other aspects of the construction. Revised architectural plans were in place by mid-June, and by early July, work on the Project was poised to move forward. National then extended the completion date for the Project to September 3, 2000.[2]

As matters stood as of the end of June, the completion date of September 3, 2000, was highly aggressive, if not unrealistic.

---

[1]Central filed a conditional cross appeal requesting the court to consider certain claims in the event that the judgment were reversed. As we are affirming the judgment, we do not address the arguments raised in the conditional cross appeal.

[2]The evidence reflects that there was an assumption or hope, apparently on the part of Old Colony and perhaps others, that the completion date would be further extended to Thanksgiving.

National, however, wanted to have the theater complex open for the Labor Day weekend because summer holiday weekends, with their large audiences and blockbuster releases, represented substantial revenue opportunities. In other words, National tried to schedule the opening of its new theater complex to coincide with a holiday or the release of blockbuster movies so as to open with a "splash." Put otherwise, there was evidence to show that National had an interest in having the Project completed and its theater complex opened before a competitor's theater in the same area opened.

There was another problem with the Project. In the spring of 2000, Old Colony was experiencing severe cash flow problems. These difficulties were due in large measure to its failure timely to bill National for work performed on the Project as well as on earlier projects. Old Colony owed substantial sums to its subcontractors, including Central, for work done on past projects. In June, 2000, Old Colony owed Central over one million dollars for its work on prior projects. Old Colony was not paying invoices in a timely fashion, and some of its checks were returned as uncollected. As a consequence, when the groundwater problem was starting to be resolved and work could have been continued, many subcontractors were refusing to return to the Project.

While the revised architectural redesign plans were complete, they called for a change in the scope of the work to be performed by Central. As things stood at the end of June, Central estimated that it would need to increase its manpower substantially on the Project in order to meet a September completion date.

It is against the backdrop of these problems that Joseph McPherson, a Central manager, informed Old Colony's project manager, Patrick Hogan, that Central would not go forward with its work unless he obtained "assurances" of payment from National. He demanded that Hogan arrange for him to meet with National's then vice-president of construction, Peter Brady.

Just prior to the July 4, 2000, holiday, Brady, Hogan, McPherson and others met. There was discussion of the fact that Old Colony owed Central substantial sums of money and that the revised scope of the work would require additional funding if Central were to accomplish its work by Labor Day. McPherson indicated that Central would not continue its work on

the Project without a payment commitment from National. He told Brady, "[Y]ou've got to guarantee me the payments. You've got to guarantee me that I will get funded for this project."[3] Brady said that "he would guarantee [McPherson]."[4] However, his promise to McPherson was not made conditional upon Old Colony's prior default in paying for the work. It was ultimately agreed by Brady and McPherson that Central would continue to work under the direction of Old Colony and that National would pay half the amount due Central on the Monday after Labor Day and the balance ten days thereafter. Central set to work the day after this meeting and achieved substantial completion of its work by August 25, 2000.[5]

In November of 2000, National issued a joint check to Old Colony and Central in the amount $679,949.75, which Old Colony signed over to Central in exchange for Central's execution of a lien waiver in favor of Old Colony. The amount of the check was a partial payment of what Central claimed it was owed, but National refused to pay Central its claimed unpaid balance of $593,237.25.[6] In the course of reconciling its account for the Project, National discovered that Brady had collaborated with the president of Old Colony in a scheme to defraud National on a number of construction projects, including the project in issue, by inflating Old Colony's contract price above what was necessary to accomplish the work and then splitting the overage.

In March, 2001, Central brought this action alleging breach of contract against Old Colony and seeking to establish a lien

---

[3]McPherson testified that he did not take the position at this meeting that Central would refuse to work on the Project in the absence of any guaranty.

[4]McPherson and Hogan were the only persons present at this meeting who testified at trial. According to Hogan, Brady did not promise to pay Central for its work but, rather, assured McPherson that National would not be the cause of any delay in payment by Old Colony.

[5]Subsequent to the meeting, the substantial completion date for the Project was advanced to August 25, 2000.

[6]There was evidence to show that the idea of issuing joint checks originated with National. It appeared that in the fall of 2000, the president of National learned that Old Colony's subcontractors were not being paid for their work on the Project. In response, National decided to issue checks to Old Colony and the subcontractors jointly to ensure that the subcontractors received payment for their work. At the time the joint checks were being issued, it had been represented to National that monies were still due under its contract with Old Colony. When National learned otherwise, it stopped issuing the checks.

on National's property pursuant to G. L. c. 254. After a default judgment was entered against Old Colony in the amount of $593,237.25, plus interest and costs,[7] Central amended its complaint to add claims against National for breach of its agreement to pay Central for its work at the Project, quantum meruit, and violations of G. L. c. 93A. The quantum meruit and G. L. c. 93A claims, as well as Central's request for a lien on National's property, were dismissed at various stages of the litigation, leaving for trial its claim against National for breach of contract.

2. *The special questions and posttrial motions.* In response to special questions, the jury found that (1) Brady did promise to pay Central the debt of Old Colony for Central's work on the Project; (2) Brady had the actual or apparent authority to make such a promise on behalf of National; (3) National's promise was supported by valid consideration; (4) the main purpose of the agreement between National and Central was to bestow a benefit upon National to which it was not already entitled; (5) National was in breach of its promise; and (6) Central was entitled to receive $593,237.25 from National as a result of that breach.[8]

After National's motions for judgment notwithstanding the verdict, Mass.R.Civ.P. 50(b), as amended, 428 Mass. 1402 (1998), and, in the alternative, for a new trial, Mass.R.Civ.P. 59(a), 365 Mass. 827 (1974), were denied, judgment in favor of Central entered.[9]

---

[7] Old Colony is not a party to this appeal. The judgment that Central obtained against National was certified under Mass.R.Civ.P. 54(b), 365 Mass. 820 (1974), and this case is before us on that certification. Apparently, there are outstanding cross claims remaining between Old Colony and National.

[8] The special questions were framed in terms of a "guaranty" rather than a "promise." We recognize the legal nature of a "guaranty," that is, a "collateral undertaking [for which] some one else is primarily liable [and which] the guarantor will pay . . . if the primary debtor does not." *Charlestown Five Cents Sav. Bank* v. *Wolf,* 309 Mass. 547, 549 (1941). See *Welch* v. *Walsh,* 177 Mass. 555, 559 (1901); *Cadle Co.* v. *Webb,* 66 Mass. App. Ct. 269, 272-273 (2006). However, in view of the situation of the parties at the time of the meeting just prior to July 4, 2000, McPherson's testimony that National's agreement was to pay Central and was not a guaranty to pay Central if Old Colony did not, and that National agreed to a payment schedule that was not contingent upon Old Colony's failure to make payment, as well as the fact that National makes no argument within the meaning of Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), to the contrary, we analyze the question before us in terms of a promise by National to pay Central, rather than a collateral undertaking.

[9] See note 7, *supra.*

3. *The issues.* National argues on appeal that Brady's alleged oral promise to McPherson at the meeting prior to July 4, 2000, was, at best, a promise "to answer for the debt . . . of another," G. L. c. 259, § 1, Second, and was unenforceable as it was not in writing. *Ibid.* National also contends that the alleged oral promise lacked consideration that would support an enforceable obligation pursuant to general principles of contract law. It also argues that Central, in demonstrating the existence of an oral agreement to which the Statute did not apply, was subject to a burden of clear and persuasive evidence, rather of a preponderance of the evidence. National raises the question whether the judge committed prejudicial error in allowing the jury to hear excerpts from Brady's deposition, during which he refused to answer questions based upon the privilege afforded him under the Fifth Amendment to the United States Constitution.

4. *Discussion.* In taking up National's various allegations of error, we begin with its argument that, if successful, would be decisive of the appeal, that is, whether the evidence was sufficient to show that Central's claim was barred by G. L. c. 259, § 1, Second.

a. *The Statute of Frauds.* General Laws, c. 159, § 1, Second, provides:

> "No action shall be brought: . . . [t]o charge a person upon a special promise to answer for the debt, default or misdoings of another . . . [u]nless the promise, contract or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized."

In ruling on National's posttrial motions, the judge applied the long-recognized exception to the Statute, the so-called "leading object" or "main purpose" exception. In *Ames* v. *Foster*, 106 Mass. 400, 403 (1871), the court stated:

> "[A] case is not within the statute, where, upon the whole transaction, the fair inference is, that the leading object or purpose and the effect of the transaction was the purchase or acquisition by the promisor from the promisee of some property, lien or benefit which he did not before possess,

but which enured to him by reason of his promise, so that the debt for which he is liable may fairly be deemed to be a debt of his own, contracted in such purchase or acquisition."

See *Nelson* v. *Boynton*, 3 Met. 396, 400 (1841) (cited in *Ames, supra,* and in which "original" and "collateral" promises are distinguished for purposes of Statute); *Hayes* v. *Guy*, 348 Mass. 754, 756 (1965) (discussing "main purpose" exception to Statute and citing Williston, Contracts [3rd ed.] § 472); *Barboza* v. *Liberty Contractors Co.*, 18 Mass. App. Ct. 971, 972 (1984) (same, citing Restatement [Second] of Contracts § 116 [1979]).

b. *Central's burden of proof.* In denying National's posttrial motions, the judge recited the evidence that she concluded was sufficient to support the jury's finding that Brady of National promised McPherson of Central that National would pay Central for its work on the Project.[10]

National contends, in reliance upon *Ryan* v. *Ryan*, 419 Mass. 86, 92 (1994), that Central was required to prove the existence of a contract to which the Statute did not apply by "clear and persuasive" evidence. The *Ryan* case involved a legal mal-

---

[10]As related by the judge in her detailed memorandum of decision:

"[T]here is evidence to support the jury's finding that Brady . . . promised to McPherson of Central that National would pay Central for its performance on the [Project] . . . . Central's bargained-for agreement to accelerate its time for performance is sufficient to bind National to its guarantee. [T]he Old Colony/Central contract had no set completion date and obligated Central to comply with schedule changes; as a result of project delays and uncertainties at the site, including groundwater issues and roof deck deterioration, the expected completion date was realistically set for Thanksgiving 2000. Following the pre-July 4th meeting between Central and Peter Brady, Brady made it clear that the work had to be completed by Labor Day 2000, a major holiday weekend, come 'hell or high water.' Central made it equally as clear that this would require it to greatly accelerate the work schedule, including adding additional workers and requiring a dramatic increase in overtime hours, in order to comply with the tighter time frame for completion. Before Central would agree to this accelerated time schedule, Central needed National to guarantee payment for the past unpaid and all future work on the project. Testimony presented at trial showed that Brady agreed to guarantee payment for Central's work and Brady and McPherson even concurred on a payment schedule. Furthermore, McPherson testified that he relied on Brady's promise when he agreed to the accelerated time schedule."

practice action in which a testator's children alleged that their father, an attorney, had made an oral promise to their mother, his wife by a marriage later annulled, that he would leave two-thirds of his estate to their children and had negligently advised her that his oral promise was enforceable.

Our reading of *Ryan* is that the court limited its holding to the inapposite circumstances there presented. As put by the *Ryan* court: "This case presents a specialized circumstance . . . [in which] . . . it is not appropriate to permit the case to be made unless the attorney-client relationship . . . and the legal advice given are proved by strong, clear, and convincing evidence." *Id.* at 93. We see nothing in *Ryan* that alters or deviates from the long-accepted "preponderance of the evidence" standard as described in *Kalker* v. *Bailen*, 290 Mass. 202, 205 (1935):

> "As the statute of frauds was pleaded, the burden rested upon the plaintiff either to prove a memorandum sufficient to satisfy the statute or to prove an original promise by the defendant to which the statute does not apply. . . . This requirement cannot be met by evidence which is at most no more than neutral, having no greater tendency to favor the plaintiff than the defendant."

See generally *Toland* v. *Paine Furniture Co.*, 175 Mass. 476, 477 (1900); *Sargent* v. *Massachusetts Acc. Co.*, 307 Mass. 246, 251 (1940); Brodin & Avery, Massachusetts Evidence § 3.3.2 (8th ed. 2007). The jury were required to find for Central if they believed that Central's contention was more probably true than not.[11] Otherwise put, it was Central's burden to support its claim by a preponderance of the evidence rather than — as alleged by National — clear and convincing evidence.[12]

c. *National's defenses to Central's claims.* National contends

---

[11]We are also of a mind that had the *Ryan* court intended to alter the evidentiary standard applied in cases brought where there is an issue concerning the Statute, it would have done so without limitation of its holding to the "specialized circumstance," *Ryan* v. *Ryan*, 419 Mass. at 93, with which it was there presented.

[12]Although the judge instructed the jury that Central had the burden of proving by "clear and persuasive evidence" that "the main purpose of [the] agreement . . . was to benefit National and not merely to guarantee Old Colony's

that the oral promise made between it and Central is within the Statute, and because Central never released Old Colony from liability, Central's claims are barred by the Statute. Its argument suggests that in order to be excluded from the operation of the Statute, the agreement in issue must effect a novation, that is, the creditor, Central, must accept the new promisor, National, as its debtor in place of the original obligor, Old Colony. National also argues that there was no evidence of a benefit flowing to it "sufficient" to bring the oral promise within the "leading object" exception to the Statute.

In support of both its contentions, National cites to a line of decisions in general accord with the proposition that "[a] promise by an owner . . . or a mortgagee . . . of land, to pay a contractor what another owes him if he will finish the building according to his contract, [is] within the statute, although the owner or mortgagee obtains a benefit." *Colpitts* v. *L.C. Fisher Co.*, 289 Mass. 232, 235 (1935). See *Gill* v. *Herrick*, 111 Mass. 501, 503-504 (1873); *Ribock* v. *Canner*, 218 Mass. 5, 7 (1914); *Slotnick* v. *Smith*, 252 Mass. 303, 305 (1925); *Collins* v. *Abrams*, 276 Mass. 106, 107 (1931); *Harold L. Baker Co.* v. *Meledones*, 352 Mass. 485, 487 (1967). The court's conclusion in these cases, that the owner or mortgagee had merely promised to pay the debt of another, rested in whole or part on the fact that the subcontractor had not released the general contractor from liability. See *Gill*, 111 Mass. at 503-504; *Ribock*, 218 Mass. at 7; *Slotnick*, 252 Mass. at 305; *Collins*, 276 Mass. at 107. See also *Greenberg* v. *Weisman*, 345 Mass. 700, 702 (1963) (acknowledging but distinguishing general proposition on basis that where original contract no longer in existence due to general contractor's repudiation of contract with subcontractor, novation not required to establish new contract with owner).

Our analysis of National's claims begins with the premise that "[i]f liability on the part of another . . . is extinguished by a novation . . . the promise is 'original' and not within the statute." *Colpitts* v. *L.C. Fisher Co.*, 289 Mass. at 234. The Statute is implicated only where a "promisor purports to add

debt," the error was harmless. The instruction was to the advantage of National and, notwithstanding any error in that instruction, the jury found in favor of Central.

his liability to a continuing liability on the part of a principal debtor." *Ibid.* See *American Fireworks Co. of Mass.* v. *Morrison,* 300 Mass. 531, 536 (1938); 4 Corbin, Contracts § 15.20, at 309-310 (rev.ed. 1997); 9 Williston, Contracts § 22:5, at 244-245 (4th ed. 1999).

Novation, however, is but one ground on which a promise is removed from the operation of the Statute. The "leading object" exception to the Statute addresses a separate and distinct set of circumstances. They are that (1) a third party is indebted; (2) there is no novation; and (3) the third party's duty to the creditor will be terminated by the performance promised by the defendant. See 4 Corbin, Contracts, *supra* § 16.12 at 362. Under the "leading object" exception to the Statute, an oral agreement that does not effect a novation may nonetheless be enforceable if the facts and circumstances of the transaction show that the promise was given primarily or solely to serve the promisor's own interests. In the decisions relied upon by National, it does not appear that the "leading object" exception to the Statute was expressly rejected as a basis for enforcing an oral contract.

In another line of decisions, it is recognized that a property owner's promise to pay subcontractors or suppliers may, in appropriate circumstances, come within the "leading object" exception to the Statute. See *Hayes* v. *Guy,* 348 Mass. at 756-757; *Barboza* v. *Liberty Contractors Co.,* 18 Mass. App. Ct. at 971. See also Gegan, Some Exceptions to the Suretyship Statute of Frauds: A Tale of Two Courts, 79 St. John's L. Rev. 319, 353 (2005). Based upon these authorities the question now before us is whether the circumstances presented in the instant case are such as to bring it within the "leading object" exception to the Statute.

There was evidence here to show that (1) National wanted to open the theater at the Project by the end of August so as to capture large audiences over the Labor Day weekend and thereby tap the revenue and business opportunities associated with a movie premier and the Labor Day weekend; (2) as of the beginning of July, the work to be completed for the anticipated opening would have to be completed in a "tight time frame"; (3) Central was one of the "core" subcontractors on the Project and was responsible for significant portions of the work to be

completed; (4) Central had completed its preliminary work and was poised to start building; and (5) given the circumstances, Central was one of the few subcontractors in Massachusetts, if not the only one, capable of delivering the necessary work in the time frame desired by National.

Under these circumstances, we conclude that the evidence was sufficient to warrant a finding that National's promise — made through Brady, who was found by the jury to have the apparent authority to make such a promise — was given to secure Central's continued and expedited performance at the Project and that the satisfaction of any obligation on the part of Old Colony was merely incidental to that promise.[13] See *Hayes* v. *Guy*, 348 Mass. at 757; *Barboza* v. *Liberty Contractors Co.*, 18 Mass. App. Ct. at 971-972.[14]

National also argues that any promise made to Central was unsupported by consideration and was, therefore, unenforceable. The thrust of National's argument is that because Central was under a continuing obligation to perform its contract with Old Colony, its pre-existing contractual obligation could not furnish consideration to support a new agreement with National. Our analysis of this claim begins with the principle set out in *Abbott* v. *Doane*, 163 Mass. 433, 436 (1895):

[13]Although National contends otherwise, it has failed to demonstrate, as a matter of fact or law, that Central's performance, including compliance with all schedule changes, was a "benefit" to which National was already entitled. National asserts that the source of Central's obligation is the written contract between Old Colony and Central, which incorporated by reference the terms of National's contract with Old Colony and obligated Central to comply with all amendments to the construction schedule. However, National has not identified the specific language of the general contract or of the subcontract it relies upon to support its assertion. See Mass.R.App.P. 16(a)(4), as amended, 367 Mass. 921 (1975). Even were we to assume that the terms of the subcontract between Old Colony and Central required Central to comply with all schedule adjustments, National has also failed to demonstrate that such contractual obligations ran in favor of National rather than Old Colony. For explanation of the showing needed to establish a third-party beneficiary claim, see Restatement (Second) of Contracts § 302 (1981).

[14]At least one commentator has viewed *Hayes* as a departure from precedent and has suggested that *Hayes* "liberalized" the so-called "guaranty clause" of the Statute. Gegan, Some Exceptions to the Suretyship Statute of Frauds: A Tale of Two Courts, 79 St. John's L. Rev. at 353. Even if *Hayes* is a departure from the precedent cited by National, it is binding precedent.

"[I]f A. has refused or hesitated to perform an agreement with B., and is requested to do so by C., who will derive a benefit from such performance, and who promises to pay him a certain sum therefore, and A. thereupon undertakes to do it, the performance by A. of his agreement in consequence of such request and promise by C. is a good consideration to support C's promise."

See *Swartzman* v. *Babcock*, 218 Mass. 334, 337-338 (1914); *Briskin* v. *Packard Motor Car Co. of New York*, 269 Mass. 394, 398 (1929); *Sheraton Serv. Corp.* v. *Kanavos*, 4 Mass. App. Ct. 851, 852 (1976).

Based on the cited precedent, we conclude that the evidence warranted the jury's finding that National's promise was supported by valid consideration. Further, it was sufficient to show that National had a direct economic interest in the timely performance of the work. Moreover, the evidence demonstrated that Central's bargained-for promise to perform rather than repudiate any contractual obligation to Old Colony was sufficient consideration to support National's agreement to pay for Central's work.

d. *Brady's testimony.* National also argues that its motions for judgment notwithstanding the verdict and for a new trial should have been allowed on the basis that the judge erred in allowing Central to read to the jury Brady's deposition testimony during which he invoked his right under the Fifth Amendment to the United States Constitution to refuse to answer on the ground of self-incrimination. Aside from the fact that National's argument fails to comply with Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), National failed to preserve this issue for appellate consideration for the following reasons that are established on the record.

In the first instance, the court correctly informed the jury several times during the trial that questions were not evidence. Further, when the judge advised counsel after the close of the evidence that she would not be giving an adverse inference instruction on the matter of Brady's refusal to answer questions at his deposition, National neither requested that the evidence be struck nor pressed that any request for a special instruction be given by the judge. Of equal importance is the fact that National took no

objection to the judge's lucid and clear instructions to the jury regarding inferences, in which she informed the jurors that they were not permitted to engage in speculation. For these reasons we decline to consider National's argument on this late claimed allegation of error.

For these same reasons, we conclude that even were we to consider National's argument, we would see no error in the judge's denial of National's motions, based upon the fact that Brady's deposition testimony, in which he invoked his Federal and State constitutionally guaranteed right to refuse to testify, was made known to the jury.

5. *Conclusion.* There is no basis in any of National's arguments on appeal that requires reversal of the judgment in favor of Central.

*Judgment affirmed.*